All right. In this matter, each side has 15 minutes. Before I start the clock, I notice one side has two people at council table. Will you be sharing time or will one person be doing all the argument? OK, and you are Mr. Simmons? Yes. All right. Thank you. You may proceed. Good morning, Your Honors. May it please the court. Sloan Simmons on behalf of defendants and appellants. I will reserve five minutes for rebuttal and try to keep a close eye on on how I'm doing to be clear out of the gates here. What this case is not about is foreclosing or closing the courtroom door to a student based upon allegations like that, which are at issue in this complaint to any remedy. What it's about is the closing of the courtroom door when it comes to a Fourth Amendment violation, because there is not and has not been and is still not today clearly established law that would establish that what is alleged in the complaint in the unique context of the special education setting and program and student behaviors at issue, that this would constitute to these large group of education. That your client violated its own policies, given this is not a negligence action. Right. Your Honor, a couple of responses to that. One, it goes kind of directly to my initial point, which is there was allegations of violations of the idea and the policy. Your your client's policy didn't even allow for seclusion. True. No, Your Honor. No, that's incorrect. The IEP didn't list seclusion. There was part of the part of the therapeutic containment program at this at this program expressly provided for both restraints and seclusion. But the individual plan did not allow for seclusion. That that is not accurate, Your Honor, that this this program in general provided for these types of of interventions with behavior. But let me take a step back from that. Even so, let's assume that it's not in the IEP. Let's assume that seclusions or for that matter, restraints or that it wasn't followed perfectly, that not all I's or dot and T's were crossed in terms of the student's program when there. That does not defeat qualified immunity. And the Couture case talks about this concept specifically. Well, this is a 12B6. So it's a little bit unusual for qualified immunity and we usually get them on a summary judgment. So we can only go with what the face of the complaint. Correct. Right. And so everything has to be all inferences go in favor of the I'm just going to say the minor here or that that that side of it, the party. So when we look at qualified immunity, first, we have to define there's two prongs. There's the constitutional right, which they're alleging a Fourth Amendment right. And then there is what was it clearly established. Right. All right. And so the judge in this case, my understanding defined the Fourth Amendment right as what? Well, Judge England defined it in what we would describe as far too broadly, which is the right against excessive physical force used on a student. And the court looked to judge and can look to the Doe case in which what you had there was a student for purely disciplinary purposes that was was taped to a tree by the principal. And this concept of that in the public school setting, whether a teacher or administrator in the context of disciplinary punishment and contact that that type of physical force is is a potential violation of the Fourth Amendment. So it would be your position that I guess there's other language. What does it call a pedagogical misjudgment? Well, I mean, in the five or four context, you can establish liability for gross, gross misjudgment from a pedagogical perspective. But we only have the 1983 here. Right. Right. Your honor, which again kind of goes back to the idea that there were remedies for these types of allegations in this complaint, whether it's under the IDEA, 504 ADA. So we're really specifically going to the court's question. How do you define the right? We have right. This is a child that from what, second through fourth grade was at this particular school. I would say it's undisputed that there the child was in the special ed program. The child had IEPs and the so how would you define what does a child like this? How would you define the right? Right. And it clearly can't be the same as, say, a child that's not in special ed. Right. And I guess I'd be careful to use the term right. What I would say is what's being alleged as the right here is is or what we would say what needs to be viewed from the court as to whether or not there was a clearly established right is whether or not a student with an IEP, with unique behavioral issues that involve admitted aggression, kicking, hitting, throwing objects that present safety to himself or others is placed in a unique and admitted to specific educational setting designed for the most emotionally deserved students and where therapeutic containment. And it's a term that's not used nowadays, but between 06 and 09, the time period at issue, a program specifically designed to address those behaviors, which the parents signed off on, acknowledging that these were going to be potential. This was going to be interventions utilized if the student presented a danger to himself or others, that that's the context we're looking at. And is there there's restraints and there's putting in the quiet room, too. Is there any other things that were used? No, Your Honor. All right. So but technically, I mean, there could be facts where, let's say someone was restrained for 20 days straight. That might put a person on notice. I noticed here there are 18 different people that are listed as having disciplined this child over a three year period. Right. Right. So what case law? Why do you say that no one was on notice? Is there what what would be the cases? What you say, DOE is not did not put them on notice. So what case law is there out there that says you can't use restraints or that you can't use quiet rooms? Well, so if we look at the case law, if we're looking at the snapshot in time, March 06 to the last alleged restraint in the complaint is February 2008. And then there's a broader allegation that restraints continued until June 2009. So that's a time period that spans about if you're if you're taking out the summer break, about 34 school months that that time period. There is at that point in time, no case that addresses this setting. Now, cases came thereafter. Right. Couture from the 10th Circuit comes in right at 08, right at the end, August of 2008, at the tail end of that time period. That's the first case that talks about these types of scenarios from a qualified immunity context. As your honor pointed out, that was a summary judgment case. There are other cases, including the more recent 2019 EC case, the 2016 parish case and the CN case from 2010, all of which were motions to dismiss and were cases that didn't involve, I would say, the amount of detail in this complaint in which if you look at the the details and the reason there's great detail in this complaint is because, in fact, these 18 defendants from the Placer County Office of Ed and another group of defendants from the Placer County Child System of Care, educational and mental health professionals were recording each one of these incidents in detail. The complaint identifies each one, time period, all involved, because this group of experts and professionals in this field were doing exactly what they assumed was the lawful program there at that school, which in itself is evidence of how reasonable what they were doing was in light of the state of the law at that time. But why didn't they notify the parents of the use of the restraints in the seclusion? One of the allegations was that the parents were unaware of the number of times restraint was used in the length of time that the child was in seclusion. Does the failure to notify suggest knowledge of wrongdoing, knowledge of a constitutional violation? Your Honor, I realize in part, Judge Beatty, that I'm stuck with the complaint in that way and that they alleged that they weren't notified. Other parts of the complaint suggested that wasn't the case, that in fact how they were being notified, that the student... There's a paragraph that suggests that what they were actually hearing was that the student had a bad day and other terminology. Not part of the record, so we can't consider it, but each of those reports which the complaint is based on shows the date and time in which the parent was notified after each incident. I get that that's not before you, but I think that goes to the concept of if they weren't providing notice, because they were maintaining these records. The complaint admits that hundreds of pages, which included these reports of each incident, were turned over when asked for by the family. If you thought, if this group of 26 educational professionals thought that what they were doing violated a clearly established law, one that was beyond debate and which would establish liability against them under the Fourth Amendment, they and their public entity employers are quite foolish for having documented every single one of them, maintained them as student records, and having them ready to turn over as soon as the parent requested. So I would say, Judge Beatty... Mr. Callahan asked you a question about how you would define a clearly established right. Right. And you defined it pretty factually specific, which is kind of what the Supreme Court tells us to do. We need to look at the circumstances of the case. And you were also arguing Judge England was incorrect for relying on Doe versus Doe. Following all that? I am, Judge Booth. And so I went back to look at Doe versus Doe, and there wasn't any indication of a case previously out there that said you couldn't tape a kid's head to a tree when he was horse playing, which is not surprising, right? I mean, you don't see that out there. So how do we reconcile there's no case out there that says you can't tape a kid's head to a tree when he's horse playing with there's not a case out here that says you can't physically restrain a kid for 112 times for 11 hours. Okay, so two points to that, Judge Booth. One is that now, unlike in Doe, we have the benefit in hindsight of case law, including cases by this court and within the circuit that have shown that these facts don't amount, either don't amount to a constitutional violation or which don't defeat the qualified immunity defense. And I know I'm getting close here, and so I'm going to answer your two questions, Judge Booth, and then I'll reserve the rest of my time. Or no, yeah? Sorry, I'll be quick. If we have questions, we're going to ask them, and we'll take all the time we want. So answer the question. So Payne, Miller, a whole host of cases post this time period have granted qualified immunity in a similar context. And so I think one window, 06 to 09, no case law in this unique context establishing a clear Fourth Amendment violation or a bar to qualified immunity. Since that time, case after case has reached the conclusion. Many on summary judgment, some not on summary judgment. And I think if the court were to look at paragraphs 56 through 79 of this complaint, and including those which include specifics about why the restraint was occurring, many of which identify kicking, et cetera, which present that type of safety issue that's there. Others simply note the restraint, which I think is fairly coy in terms of the drafting because there is an explanation for each of those restraints. Paragraph 80 has a full paragraph, which is more reflective of the type of records being maintained. And I would also turn the court to the reference to 112 restraints and the minutes involved needs to be put in context. So who are all the appellants, though? Who are all the appellants? All the appellants, Your Honor, are the individual defendants who at the time were employed by the Placer County Office of Education. Those include two supervising educators in the program, several teachers, and at least two other staff members who are in non-teaching capacity. So do we have to analyze them individually? Well, Your Honor, appellants would, of course, like you to grant qualified immunity to every single one of them, but I think if not, there is an obligation from a 1983 perspective to look at the allegations in the complaint as they specifically allege constitutional violations for each defendant. And when you do that, what you end up with is the vast majority of these defendants, having participated with others, because the policy required multiple staff to be involved at once to protect for safety, some folks have been involved in free restraints over a three-year period. And so what about the school district? What's the situation? Well, school district was named as a defendant in the 504 and ADA action, as was the Placer County Office of Ed. Those two claims were both dismissed for being untimely. So the school district isn't here, so these are just all the individuals? Individual defendants employed by the Placer County Office of Education. The County Children's System of Care individual defendants joined in and also moved to dismiss for the same grounds below, but did not join in this appeal. But I want to go back to the minutes. AB, which is a case relied on by the other side, AB involved 3,600 minutes of placing a student in a restraint chair in a six-week period. I use minutes because that's what the complaint does, is they break it out into minutes. So a six-week period for a student between September and October of a school year, the student was placed in a restraint chair for 3,600 minutes. That one-month period over a six-weeks period, the time there in which the only defendant in the AB case who qualified immunity was not granted to on summary judgment is more minutes than were accumulated in full with all the restraints and the isolation alleged here over the 34 months of school that were at issue. And in fact, if you break down the number of restraints over the time period, the student was restrained on average three times per month. It didn't happen that way, because the student's behavior would spike and there'd be a number of restraints, but it is not as bad as the complaint paints it. And if this court looks to the complaint, there are the facts alleged in fact support the granting of qualified immunity due to the lack of clearly established law between 06 and 09 in this area. All right, I'll give you three minutes for rebuttal. Thank you. Since we had a lot of questions. All right. Thank you. May it please the court. Good morning. Good morning, Your Honor. Christian Rogendorff for the plaintiffs. The only reason that Emmons or the plaintiff's IEP would matter in this case is if the defendants actually followed it, but they didn't. All of the discussion about distinguishing this case on the basis of the IEP is a non sequitur of straw man. Your Honor asked, what is the right here? And does it differ in this context? And I think the answer properly is no. All students going to school have a right to be free from punitive, disciplinary, physical assault. But I think the way that I would be inclined, I think that Judge Englund did define the right at a too high level of generality. And the Supreme Court has cautioned the Ninth Circuit particularly on many occasions about that. Because the District Court's broad definition of the right here with all the recent Supreme Court cases telling us to define Fourth Amendment rights with specificity when addressing qualified immunity. Children that like the minor in this case is very different than the average student. Your Honor. He has a lot of issues. And he's got violence, he's got, and these things pop up. And so I guess, I'm trying to figure out, it's over a long period of time. What's your best case for the argument that anytime school officials use restraints and seclusions in a manner that exceeds what is permissible under the IEP, that it amounts to a violation of a clearly established law under the Qualified Immunity Framework? Well, this would both be, let me answer your question in two parts, if I may. The first part is, Emmons applies where factual situations are unclear. That was where a man came out of an apartment, closed the door, ignored the officer, and was taken down without pain and handcuffed. In that situation, the court asked, well, is there a violation here? We don't know. That's not alleged, or there's nothing specifically in the law that an officer could look to. Here, the question is, can you hold a seven-year-old child on the floor face down? And without a safety reason, the answer, we would argue, is clearly no, and where it is absolutely clear to any reasonable public official. But the law says you can restrain. I mean, what in these are restraints that are not allowed? For safety, for safety, Your Honor. And we have alleged specifically that at least some of these, and we don't know which, were not purely for safety, that they were punitive, that they were as punishment, or they were just because the teachers or the officials were frustrated with the student. Well, so are you alleging that by the number of times that it happened? No, no, Your Honor. We've actually alleged it in the complaint in paragraphs, let me see, 127, 121 through 127. But how do you not know which ones you allege to be punitive if they were recorded, and if all of the records were turned over to you? Because we can't tell, Your Honor, and the number of them, and the fact is the IEP is a shield to the defendants, but they didn't follow it. It's not a sword that we're trying to use. We're not saying they violated the IEP, so it's a Fourth Amendment violation. What we're saying is, without the IEP in place, and without them following it, use of physical force of this type and of this magnitude is at least presents on a motion to dismiss a facial Fourth Amendment violation of which any reasonable public official should have known. Anyone, I imagine if, and obviously this is in the record, but I imagine if you go and ask a teacher in a public school, if you're irritated with one of your students, can you go ahead and put them in an armbar and put them on the floor? No, you can't. That right is clearly established. Any reasonable public official would know that. But this is not this case. But that is, but Your Honor, on the complaint it is. These are perfectly acceptable and perhaps successful summary judgment arguments from defense. But this is a motion to dismiss, and we are in the stage of qualified immunity should grant these defendants complete immunity from suit based on these facts, and that just does not follow, I would say. But what evidence is there of, I sort of equate this not so much to the police officer situation. Like we get 1983 cases of medical indifference in the prison sense. And in that sense, medical malpractice of say people, prisoners that are in jail is not a basis for a 1983. It has to be deliberate indifference. That they have to show deliberate indifference. Here, pedagogical, I know, easy for me to say. Pedagogical mismanagement is not a basis for a violation. We agree. And so why is this not, even giving you all the inferences, why is it not pedagogical mismanagement as opposed to? Because frankly, we need to go through discovery to find out why. Okay, you're listed on this date. Do, you know, teacher A, do you remember this particular instance? If yes, why did you put them in there? Well, because he was doing X. And do you think that this was the only way? Because of course the IEP says it has to be for non-punitive reasons. And it has to be as a last resort. What else did you try? What else, you know, what other steps are in place to prevent you from having to put this little kid on the floor with an armbar? What is, you know, and that is a matter of law for this court to say, well, if there's an IEP in place, it's fine. The carte blanche that defense are asking for is exactly the problem that your honors were hitting on when you were asking, what is the right? Because the right cannot here be defined with any more specificity. It is the right for- Well, I don't think Doe is the right case here. So give me another case. Well, in fact, there are several. I mean, I don't think Doe is the same as this. It's not the same, your honor, but it's the same as TLO or Ingram or any of the old Supreme Court cases that say you have a right to be free from coercive physical force by the government. Now that is, yeah, too high of a generalization, but yes, your honor. Let's follow Judge Callahan's lead, just for hypothetical reasons, that it's too broad as defined by the district judge here. Help us define the clearly established right that you would like us to write in an order if you were to win, because what I hear you saying is when a defendant violates an IEP and uses physical restraint for some reason other than safety, because that's what I hear you saying. Some, yes, and I think that it's some reason other than safety or pedagogical purposes, whatever that, if it's for punishment, I don't think the IEP even comes into play, your honor. That's what I'm trying to get at, and that's, I guess, the difficulty I'm having articulating. The IEP is there to guide the officials, and if they had followed it, which is true in, I believe, almost all of the other cases that go in the other direction, in granting qualified immunity, all of those followed the IEP, or the allegations were such that they were close enough. It was a matter of, I think, I can't remember which one it was. I think it was Payne, where the parent just didn't like that the student was being held in the room for so long. Okay, but what support is there for the fact that you get to go on a fishing expedition for a three-year period of time? Why don't you have to put some evidence forth where the inference could be that it was for other than a pedagogical mismanagement? Well, your honor, I think that, A, the sheer volume does come into play there. At this point- But they're different people, so at a point when you're confronted, you know, I mean, this happens over three years, and there are, what, I thought there were 18 people, but apparently there's like 20-something people, or whatever, and let's say a child, and I think it's fairly undisputed that this child does have issues in terms of behavior, and so if the child is kicking, or biting, or spitting, and you're the only person there- None of these examples have only one person there, your honor. That's why there's 18 people listed. Some people are listed. I have, I actually have it written out what we did. Well, is that better or worse? So does that mean that then they have to be in concert to do something penological to this person, or is it they're responding to, I mean, the reality of this, like police officers get qualified immunity when it turns out that a person didn't respond, and they pulled out a toy gun at the officer, and the officer kills them. Well, later the officer knows that it's a toy gun, and he or she did not need to kill the person, but at the time, under those circumstances, so all of these are flaring up, and at the time, what do you do with a child that could hurt other children, could hurt the teachers, you can't control? That's a very good question, your honor. So, I mean, what in the complaint says that it doesn't say they used a chokehold, it says it's restraints that are in the IEP, it's a quiet room, and so I guess, what would put them on notice that what they're doing is a violation of a clearly established law? Because they're, number one, not informing the parents. So, I mean, they're not following the IEP. And in saying, you know, he had a bad day. Is not informing the parents a Fourth Amendment violation? No. I mean, we're under 1983, we gotta go 1983. Yeah, no, I mean, that is absolutely not. Saying he had a bad day does not say, we put him down, held him on the floor for 20 minutes, and then put him in the closet for two hours. No, it doesn't. He had a bad day is as vague and uninformative as possible. And that is the problem that was going on here. And so what we're looking at, I think the answer to your question is, where do we find this in case law? I actually found a case, and now it's a district case, Arizona. But it was from 1996, called Rasmus v. Arizona. And the citation is 939 FSUP 709, 1996 case, saying that the use of a timeout room can present a Fourth Amendment violation, citing TLO. And also citing the idea that where there's no clear case declaring conduct is unconstitutional, they can still be liable if it's just patently unreasonable. And that's Pierce v. Multnomah County, that's this circuit's case, 76 F. 3rd, 1032. The idea that the IEP gives educators a blank check to hold down students and throw them in isolation for extended periods, and whether it's 648 minutes of restraint and 2,700 minutes of seclusion, or 3,600 or 4,600 or 1,000. If it's not for a good reason, then it shouldn't be allowed. So here's what I'm struggling with, and I'd like to give you an opportunity to respond to it. I wanna hear what you have to say about this. So it seems that what you're saying is, we don't know that any of these things happened. I mean, we know the child was restrained, and we know that he was placed in isolation at various times, but we don't know which of any of those incidents were not for safety reasons or legitimate pedagogical reasons, right? So you don't know, you've told me you can't answer that question. So when is it that the 12B6 standard is so lenient that you can file a complaint that says, we don't know, but we think something may have been unconstitutional? I mean, don't you have more of a burden to file a complaint that alleges sufficient facts, that you have a claim? Because if you don't know, I mean, it's just kind of, we have a hunch that maybe this wasn't because he was posing a safety risk to himself or others. We think it must have been punitive. It seems there has to be more than that. Well, given the volume, Your Honor, and I think that the district court agreed, given looking at these facts as alleged, there's something wrong. Well, and that, of course, doesn't mean that your clients were without remedy. There were other claims that they could have brought that might have, through the course of discovery, established a constitutional violation, but it seems now you're pursuing a claim that, gee, there might've been a constitutional violation, but we don't know, and I can't identify a single instance to the court where we're saying this violated, this wasn't done for safety reasons. Well, I'm looking at the record, Your Honor, and on the complaint, I can't say on the record, I can't point to a specific instance. I believe that there are specific instances that can be testified to. So how is it not speculative? Well, what I'm saying is, on this record, it's the complaint, and the complaint alleges that these particular restraints, at least some, if not all of them, were beyond the scope of the IEP, and they're facially beyond the scope of the IEP from the get-go, because they didn't adequately inform the parents. But you've already acknowledged that violating the IEP is not a constitutional violation. It's not, it's not, but at the same time, nor does that shield them then. So that would mean that every time they took this child down or secluded him, there had to be a safety violation. There had to be something that the defendants can articulate, this is why we did it. And looking at the list of records, and the district court noted, when he dismissed the claim the first time, and then we filed the First Amendment complaint, I see my time's almost up, but if you'll let me finish. The idea that each of these individual people, each of these individuals participated in some sort of act was required of us to plead from the district court after the dismissal. And if I may finish. Yeah, go ahead and finish, because I have another question for you. So you're on our, you're on judge time now, so. Thank you, Your Honors. The need to plead the individual liability for each defendant necessitated the pleading as it is. And certainly the parents would have done something with their child had they been informed, and it would not have continued, and spiraled, and spiked, and everything else, to the point where the child just didn't wanna go to school, and it was digressing, or regressing. But the parents did do things, because they had, you have an annual IAP. These parents obviously know their child, and I'm going to assume that this child is, that's not the only, school is not the only place where this child has difficulties with the diagnosis that they have. And the parents did separately challenge, and had hearings, and got many additional, there's some other settlement out there, and accommodations to, because a child's entitled to FAPE. And that's evaluated as an as go along. And so at some point it was determined this wasn't working for this child. This child can't be at this school, and other things happened, right? And so those are other remedies, but here we're on a 1983, so. Right, and so I mean it took time, because of course when you have a child who's this disturbed, and who has problems, they're going to be trying things, and in fact the parents have to give them the benefit of the doubt. So at some level, it's not a fishing expedition to go ahead and say, there's something wrong, because we didn't know this, and we weren't informed of this the entire time. I understood your answer to my question to state that the sheer number of incidents over time, the number of times the child was restrained, the amount of time of each restraint, the amount of time in seclusion, all of that is the basis for your allegations, even though you can't identify a particular incident, wait for it, okay? So where's the constitutional violation? If it's the sheer volume of time, and the number of incidents, does that mean at the first incident, those defendants did not violate the Constitution, but at the 112th, they did. I mean, it seems to be at some point, because you're basing it on the number of incidents, when does it cross over from the first 10, 15, 20 incidents are not a constitutional violation, but at this number, they are. Well, I believe that's a matter for expert testimony. It's really what it comes down to, Your Honor. We would have an expert say, okay. But where, as a matter of constitutional law, were the defendants on notice? Where would they have been put on notice that they were violating a constitutional right, a clearly established constitutional right? Well, when they, A, if it was used for punishment, B, where it, you know, and that's, I see where you're going, and I see, I understand the question. And I would say that the place where it crossed the line would certainly be when it's used for punishment or for a non-therapeutic reason. And so we can avoid the pedagogical. But for a non-therapeutic reason. Do we know when that happened specifically? Perhaps, but not in a complaint. Is there, at some point, a basis at which an expert can come in and say, by this month, you should have known that this is a problem and you should not have been using these methods anymore. So the claim is once the methods are shown to fail, then if you continue to use them, it's just for punishment. I would say that yes, and that is probably the contextual answer to when does this begin? When you know you're not getting, the kid's not getting any better and he's not, he's regressing. If that is a standard that's somewhat vague, so be it. But I think the right here, the clearly established right, is the right to be free from physical violence without a therapeutic or safety reason. And so at some point, is that a matter for expert testimony? Yes. It might even be a question for the jury after an expert. But there is, I think, the right itself. And Emmons doesn't even go into the, Emmons doesn't touch this part because it's not a matter of when do you get qualified immunity. It's do you get qualified immunity, freedom from suit, complete freedom from suit, based on having an IEP in place. And that's what the defendants are advocating. And that's what I would strongly, strongly urge this court to reject. Because once that IEP is in place, it is not a blank check and you have to go through a discovery. So how old is the child now? I'd have to do the math, Your Honor. It's 13 years from now, so 1920, somewhere around there. Okay. All right, thank you. I've got one brief question, if I could. Yes, sir. You kind of had a lot of issues going on at the beginning of the case and it was dismissed and you were allowed to refile. Was there some sort of written discovery that revealed each of these incidents so you could tally it up so that you could make these specific complaints? Because- Yeah, the school district turned over records, Your Honor. And that's what the new complaint was based upon, were those written records. So it wasn't like you just hypothetically made up these hours. No. No, no, Your Honor. Okay, thank you. And let me, if I may just add very briefly, the defense mentioned a failure to respond to the individualized allegation argument. That was not even part of the motion to dismiss and so it's not properly before this court. And I just wanted to raise, it's not even cited. There's no citation to the record for their argument about the individualized allegation. So I don't even believe that's properly before the court. All right, thank you. Thank you. All right, three minutes. And any other questions we have? Okay, thank you, Your Honor. Three minutes or until we let you go. Okay, right. The records, the question just posed to Judge Booh. The records, there has been no discovery in this case. Those records were based upon that which is alleged in the complaint to have been disclosed pursuant to the parent's student records request in July, August of 2009. The original complaint included the same numbers and tallies. What it didn't do was specify who they were alleging was involved in each. The complaint still lacks, and I'll go to one of the points here. There is not one allegation in the complaint of physical injury resulting to the student based upon the restraint. There's an issue of him hitting his neck on the window seal and a bruise when there was some of him and a staff member involved early on. But there is not one allegation in the complaint of actual physical injury during this time period resulting. So that's the first point I'd like to raise. Two, paragraph 51, counsel suggests that the basis for the allegations here is that the restraints are being used for punitive or disciplinary measures. I beg the court to find one allegation in this complaint of all the restraints alleged based upon those reports. It was an allegation that it was to change future behavior. Right, so there's one half of a sentence in paragraph 51 that suggests that it was being used to change future behavior. But it doesn't say it was punitive or disciplinary. That is not alleged, let alone in any detail whatsoever. What counsel's proposing in terms of expert analysis and discovery review, risk turning every one of these, which are always complicated cases from an IDEA perspective, and ones which can lead to suits based on the ADA in section 504, but converting that scenario in which there's several remedies available, including claims that can result in monetary damages. So it's your argument basically that they may have claims and there are avenues to do that, but it's not a 1983? It's not a 1983 Fourth Amendment claim. And I just, I bristle when I hear the proposed scenario where we're gonna do expert discovery and then analyze each restraint in a special education context because there's a potential Fourth Amendment violation each time the IEP isn't followed when it's done. And so I think to the extent the court wants to frame this right, which I know it's an issue clearly that you're grappling with, and I can understand the benefit for providing some type of clarity going forward, I would say however the court defines that right, it should not defeat the qualified immunity which is sought in this case and deserved by the individual defendant. So if this court comes to a conclusion that in fact, and my panelists disagree that there is a Fourth Amendment right that lingers here under these facts, if the court does reach that conclusion, it should not defeat the qualified immunity which the defendants are entitled to. And I wanna turn specifically the court back to paragraph 44, 97, 78 through 87. All of those paragraphs specifically describe the aggressive, dangerous behavior, admit that it continued, escalated with intensity and frequency. And yes, they can say it may have been because it wasn't the right program, but that's an IDEA 504 issue, it's not a Fourth Amendment issue. So admitted members on minutes of restraints and minutes of seclusion and how that correlates to minutes that the child would have been in school. Now I'll admit, Your Honor, math has long since passed as my area of expertise. That's why you went to law school. Right, right. So if we're looking at March 2006 to June 2009, and I'm gonna take that later date even though the allegations of restraint stop in February 08 in the complaint. That gives you, if you take away two months of summer break, 34 months of school between those two time periods. So if you're gonna look at 112 restraints alleged during that time period, that equates to 3.3 restraints per month, per school month. If we're to look at the 80 minutes, if you break down the minutes for alleged seclusion, what that equates to is 80 minutes of seclusion per school month. Which if you're to, that 80 minutes equating to one hour and 20 minutes, assuming there's 20 school days a month, that's four minutes of seclusion a day if it was occurring each day. This is, if you look at how they're alleged, what happens is the student's behavior spikes. There's a couple of restraints and seclusion in a given day. Then it goes silent. Then it spikes and comes up. And so over a three year period, if you look at any of the cases from Miller, Payne, and EC, any of these cases which an AB relied upon by the other side, and you break down what we're talking about in terms of amount of time, this case is actually the best facts for granting qualified immunity in terms of the actual numbers utilized over the applicable time period. And there wasn't clearly established law during that time period. Any additional questions? All right, apparently we have no additional questions. This matter will stand submitted. Thank you for your helpful argument in this matter.
judges: Callahan, Bade, Bough